**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GENERAL BINDING CORPORATION,** | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | FILED: JUNE 06, 2008 |
| v. | ) | Case No. 08CV3266 |
| | ) | |
| **STOPOL, INC.,** | ) | JUDGE DER-YEGHIAYAN |
| an Ohio corporation, | ) | MAGISTRATE JUDGE COX |
| | ) | RCC |
| Defendant. | ) | |

**COMPLAINT TO ENFORCE PROMISSORY NOTE**

Plaintiff General Binding Corporation ("GBC") complains of Defendant Stopol, Inc.

("Stopol") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      GBC is a supplier of branded office products, including a variety of binding and

laminating machines and supplies.  GBC is a Delaware corporation, and maintains its principal

corporate office in Northbrook, Illinois.  GBC is therefore a citizen of Delaware and Illinois.

2.      Stopol, Inc. buys and sells businesses, divisions, product lines, equipment and

manufacturing licenses—primarily in the plastics industry.  Stopol is, on information and belief,

an Ohio corporation, and maintains its principal corporate office at 31875 Solon Road, Solon,

Ohio  44139.  Stopol is therefore a citizen of Ohio.

3.      GBC and Stopol are citizens of different states within the meaning of 28 U.S.C. §

1332(a)(1).

4.      The amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs.

5.      There is consequently complete diversity of citizenship between the parties, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

6.      The promissory note at issue in this case was deemed to have been delivered in Lincolnshire, Illinois.  Under the terms of that instrument, Stopol consented to the jurisdiction and venue of this Court.  Venue therefore lies in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) and (3).

## BACKGROUND

7.      GBC and Stopol entered into a Stock Purchase Agreement dated as of November 30, 2007 (the "SPA").  A true and correct copy of the SPA is attached hereto as Exhibit A, and is incorporated herein by reference.

8.      Pursuant to the SPA, GBC sold to Stopol 100% of the outstanding shares of capital stock of VeloBind Incorporated, a Delaware corporation (the "VeloBind Shares").

9.      In consideration for the VeloBind Shares, Stopol agreed, among other things, (i) to pay a fixed payment to GBC in the amount of $965,497.00 (the "Fixed Payment"), (ii) to market and offer for sale the assets of VeloBind Corporation via an auction to be conducted in Pleasant Prairie, Wisconsin (the "Auction") and (iii) to pay a contingent payment to GBC in the amount of 25% of the proceeds of the Auction, to the extent those proceeds exceed $1,347,500.00 (the "Contingent Payment").

10.     To evidence its obligation to make the Fixed Payment, Stopol made, executed and delivered to GBC a Promissory Note dated as of November 30, 2007 (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit B, and is incorporated herein by reference.

2

11.    Pursuant to the Note, Stopol promised to pay $965,497.00 (together with applicable interest) to the order of GBC. Stopol agreed to make periodic payments on this instrument as and when it sells the Assets, with 80% of the gross sale proceeds to be allocated to such payments. Stopol further agreed to make the Fixed Payment on or before February 29, 2008 (the "Maturity Date").

12.    GBC and Stopol entered into a First Amendment to Stock Purchase Agreement dated as of February 28, 2008 (the "SPA Amendment"). A true and correct copy of the SPA Amendment is attached hereto as Exhibit C, and is incorporated herein by reference.

13.    GBC and Stopol also entered into a First Amendment to Promissory Note dated as of February 28, 2008 (the "Note Amendment"). A true and correct copy of the Note Amendment is attached hereto as Exhibit D, and is incorporated herein by reference.

14.    Pursuant to the SPA Amendment and the Note Amendment, the Maturity Date was extended to March 26, 2008.

15.    While making some interim payments to GBC, Stopol failed to make payment in full on the Note prior to the Maturity Date.

16.    The Maturity Date has now passed, and the Note is presently matured, due and owing.

17.    As of the Maturity Date, the principal balance outstanding under the Note totaled $515,497.00.

18.    Under the terms of the Note, the unpaid balance outstanding thereunder bears interest from and after the maturity date at the rate of nine percent (9%), computed on the basis of a three hundred and sixty-five (365) day year.

19. Subsequent to the Maturity Date, Stopol has made additional payments on the Note, and interest has accrued thereunder. As of May 27, 2008, and taking these payments and accruals into account, Stopol is currently indebted to GBC under the Note in the amount of $422,717.18 (the "Outstanding Balance"). A spreadsheet itemizing and reconciling the Outstanding Balance is attached as Exhibit E hereto, and is incorporated by reference.

20. Under the terms of the Note, interest continues to accrue on the unpaid Outstanding Balance.

21. Also under the terms of the Note, GBC is entitled to receive the Contingent Payment, to the extent any such payment has been earned. As of the present date, Stopol has not provided GBC with a sufficient accounting to determine if a Contingent Payment has been earned.

22. The Note provides, in pertinent part, that:

> ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OF THE OTHER OBLIGATIONS SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS, OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY PROPERTY MAY BE BROUGHT, AT PAYEE'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH PROPERTY MAY BE FOUND. MAKER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS, AND OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE.

*See* Note, 3.

## ENFORCEMENT OF PROMISSORY NOTE

23.     Stopol signed the Note.

24.     Stopol delivered the Note to GBC.

25.     Stopol received due and sufficient consideration from GBC for the Note, through the sale and delivery of the VeloBind Stock, as well as through the other terms of the SPA.

26.     GBC accepted the Note.

27.     GBC is the holder of the Note, and entitled to enforce it in accordance with its terms.

28.     All conditions precedent to the enforcement of the Note, if any, have been satisfied.

29.     The Outstanding Balance is matured, due and owing from Stopol to GBC without defense or offset.

30.     To the extent a Contingent Payment has become due and owing under the Note, such Contingent Payment is matured, due and owing from Stopol to GBC without defense or offset.

*(The remainder of this page was intentionally left blank)*

WHEREFORE, for the foregoing reasons, General Binding Corporation respectfully requests that this Court enter judgment in its favor, and against Stopol, Inc., in the amount of the Outstanding Balance, plus the Contingent Payment (to the extent one has been earned), plus such additional accrued or subsequently accruing interest, costs and attorneys' fees as may be liquidated and proven. GBC further respectfully requests that this Court grant such other and further relief as may be just and fitting under the circumstances.

Dated:      June 6, 2008
            Chicago, Illinois


**GENERAL BINDING CORPORATION**


By: /s/ Jeffrey Chang
            One of its Attorneys


Jonathan W. Young (#06204590)
Jeffrey Chang (#06292539)
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone: (312) 201-2662
Facsimile: (312) 416-4524
Email: young@wildman.com
        jchang@wildman.com



08CV3266
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE COX

# EXHIBIT A

Stock Purchase Agreement

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of November 30, 2007 by and between General Binding Corporation ("Seller") and Stopol, Inc. (the "Purchaser"), and for purposes of Sections 3 and 6.1 hereof only, ACCO Brands Corporation, a Delaware corporation, the parent company of Seller ("Seller Parent").

## R E C I T A L S

A.    Seller owns 100% of the outstanding shares of capital stock ("Shares") of VeloBind Incorporated, a Delaware corporation (the "Company"); and

B.    The Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, all of the Shares upon the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.    Sale and Purchase of the Shares.

1.1    Sale and Purchase.  At the Closing, Seller shall sell, assign and transfer to the Purchaser all of the Shares, and the Purchaser shall purchase from Seller all of the Shares.

1.2    Purchase Price.  The purchase price to be paid by the Purchaser to the Seller in exchange for the Shares (the "Purchase Price") shall have a fixed portion and a contingent portion. The fixed portion of the Purchase Price shall be $965,497. The contingent portion of the Purchase Price shall be an amount equal to 25% of the Company's proceeds from the auction referred to in Section 7.2(a) in excess of $1,347,500.  The Company's proceeds from said auction shall not include the proceeds from any pre-auction sales, any buyer's premiums paid by successful bidders at the auction, and/or any sales taxes collected with respect to items sold at said auction.

1.3    Payment.  The $965,497 fixed portion of the Purchase Price shall be paid to the Seller by the Purchaser as follows:  at the Closing, by delivery of a promissory note in a form attached hereto as Exhibit A (the "Note") payable to Seller on or before February 29, 2008 in an amount equal to the $965,497 fixed portion of the Purchase Price. Prior to February 29, 2008, Purchaser shall make periodic payments to Seller on the Note as it sells the Assets (as defined in Section 3.4) at the rate of eighty percent (80%) of the gross sales proceeds of each item of the Assets that Purchaser sells ("Subsequent Sale"). The contingent portion, if any, of the Purchase Price shall be paid to the Seller by the Purchaser within 30 banking days from the last day of the auction referred to in Section 7.2(a).

1.4    Grant of Security Interest.

(a)    For value received, Purchaser grants and will cause Company to grant a first priority security interest to Seller in all of the Assets. The security interest granted is given as collateral security for the payment of the amount due under the Note.

(b)     Purchaser shall at all reasonable times allow Seller, by or through any of its agents, to examine and inspect the Assets. Upon removal of any Assets from Seller's premises and until the consummation of a Subsequent Sale for such Assets, Purchaser shall have and maintain insurance against customary risks at least equal to a reasonable, nonliquidation fair market value with respect to such Assets.

(c)     Purchaser shall (and shall direct Company to) do, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as Seller may require, to more completely vest in and assure to Seller its rights hereunder and in or to the Assets. Seller is expressly allowed to file a UCC-1 financing statement to perfect its security interest in the Assets.

(d)     Upon a material breach of the terms herein by Purchaser, including a payment default under Section 1.3, and at any time thereafter, Seller shall have the rights and remedies of a secured party under the Uniform Commercial Code as in effect from time to time in the State of Illinois, and all other rights and remedies available under applicable law or in equity.

(e)     Seller shall release its security interest in the specific Assets being sold in connection with a Subsequent Sale until the Purchase Price is paid in full, at which time the Seller shall release its security interest in all of the remaining Assets.

2.     The Closing.

2.1     Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall be held on the date first set forth above at the offices of Seller.

2.2     Closing Deliveries.

(a)     By the Seller. At the Closing, Seller shall deliver to the Purchaser (i) the stock certificate(s) representing all of the Shares, with duly executed stock powers attached in proper form for transfer to the Purchaser, (ii) the minute books and stock record books for the Company, (iii) the resignations of all of the Company's officers and directors pursuant to Section 3.7(a), (iv) the amendments to the Employee Benefit Plans required pursuant to Section 7.5 (and all necessary or appropriate corporate resolutions authorizing such amendments), (v) workpapers or other documents reasonably satisfactory to Purchaser's counsel reflecting the tax basis in each of the Assets as of the Closing, and (vi) such other instruments or documents as are, in the opinion of the Purchaser's counsel, reasonably and customarily required.

(b)     By the Purchaser. At the Closing, the Purchaser shall deliver, or cause to be delivered, to Seller (i) the Note, (ii) a certificate of insurance pursuant to Section 7.2(c) and (iii) such other instruments or documents as are, in the opinion of the Seller's counsel, reasonably and customarily required.

3.     Representations and Warranties of the Seller. Seller and Seller Parent jointly and severally represent and warrant to the Purchaser:

3.1    Authority.  The Seller has the requisite power, legal capacity and authority to enter into and perform its obligations under this Agreement and all agreements and documents contemplated by this Agreement and to consummate the transactions contemplated by this Agreement and such action has been duly authorized by all necessary corporate action by Seller, including due and proper approval from Seller's board of directors.  This Agreement has been duly executed and delivered by the Seller and constitutes the legal, valid and binding obligation of the Seller, enforceable in accordance with its terms and does not violate or conflict with or result in a breach of any agreement or obligation to or by which Seller is bound.

3.2    Title to Shares.  Seller is the record and beneficial owner of the Shares and has the power, right and authority to sell, assign, transfer and deliver to the Purchaser the Shares.

3.3    Capitalization.

(a)    On the date hereof, the Company's authorized capitalization consists of one hundred (100) shares of common stock, par value $0.50 per share.

(b)    The Shares constitute 100% of the shares of capital stock of the Company that are issued and outstanding.  The Company does not hold any of its shares of capital stock in its treasury.

(c)    The Shares are validly issued, fully paid and nonassessable.  The Shares were issued in accordance and compliance with all securities and other laws.

(d)    Seller has good and valid title to the Shares, free and clear of any lien, pledge, encumbrance, option, right of first refusal, claim or restriction.

(e)    The Company is a corporation duly organized, validly existing and in good standing under the laws of Delaware, with full corporate power and authority to own its assets.

3.4    Assets.  As of the Closing, the only assets of the Company are the items solely set forth on Exhibit B hereto (the "Assets").  The Company has good and marketable title to the Assets.  The Assets are not subject to any lien or encumbrance.  All of the Assets are located at Seller's Pleasant Prairie Wisconsin Plastic Plant.

3.5    No Liabilities.  As of the Closing, the Company has no liabilities, whether known or unknown and whether absolute, contingent, accrued or otherwise.  As of the Closing, the Company does not guarantee any obligations of the Seller or its affiliates.

3.6    Tax Basis, etc.  As of October 31, 2007, the Company's tax basis in the Assets was no less than $202,499.  As of the Closing, the Company has an alternative minimum tax credit ("AMT credit") of no less than $92,000.  As of the Closing, no state or local income taxes would apply to any income or gain resulting from any sale by the Company of any Asset other than Wisconsin income tax at the rate of 7.9%.

3

3.7    Employees, Officers and Directors.  As of the Closing, (a) all of the Company's officers and directors have resigned and (b) the Company has no employees or independent contractors.

3.8    No Subsidiaries.  As of the Closing, the Company has no subsidiaries.

3.9    No Litigation or Proceedings.  There exists no litigation, investigation, action, suit, claim or proceeding (the "Actions") now pending or, to the best of Seller's knowledge, threatened (or existing but unasserted) before any court, administrative or regulatory body, governmental authority, arbitration or mediation panel or similar body, to which Seller or Company is a part arising out of the Company's business or the Company's properties or assets or which is likely to prevent the consummation of the transactions contemplated by this Agreement. There is no outstanding order, notice, writ, injunction or decree of any court, governmental agency, or government against or affecting the Company or its business, properties or assets. There has been no Action to which Seller or the Company was a party affecting the Company or its business, properties or assets that has been revolved within the past three years.

3.10    Employee Benefits Matters.

(a)    Except as set forth on Schedule 3.10(a) Company does not and has not ever in the six-year period preceding the Closing maintained or contributed to any Employee Benefit Plan and Company does not and will not in the future have any liability with respect to any Employee Benefit Plan.  In addition in the six-year period preceding the Closing, Company has not contributed to any Employee Pension Benefit Plan (as defined in Section 3(2) of ERISA), other than a defined contribution plan.  In the six-year period preceding Closing all contributions required to be made by Company to any Employee Benefit Plan have been timely made.  Each Employee Benefit Plan that is intended to be qualified under Code Section 401(a) has received a favorable determination letter from the Internal Revenue Service as to the plan's tax-qualified status, and there is no fact or circumstance that could reasonably be expected to adversely affect the tax-qualified status of such plan.  Each Employee Benefit Plan has been administered in all material respects in accordance with its terms and applicable law.

(b)    Except as set forth on Schedule 3.10(b), none of the Company, Seller or any ERISA Affiliate has in the six-year period preceding the Closing sponsored or maintained an Employee Pension Benefit Plan subject to Title IV of ERISA or the minimum funding requirements of Section 412 of the Code.  Except as set forth on Schedule 3.10(b), none of the Company, Seller or any ERISA Affiliate has in the six-year period preceding the Closing maintained, contributed to, been obligated to contribute to, or incurred any Liability with respect to any "multiemployer plan" (as defined in Section 3(37) of ERISA).  No Employee or former Employee of Company has accrued a benefit or has any entitlement to benefits under an Employee Pension Benefit Plan sponsored by Company, Seller or an ERISA Affiliate which is subject to Title IV of ERISA or under any multiemployer plan contributed to at any time by Company, Seller or any ERISA Affiliate.  Except as set forth on Schedule 3.10(b), no Employee Benefit Plan maintained by Seller or any ERISA Affiliate provides for post-employment medical, life or welfare benefits, except as required by Section 601 of ERISA.  No employee or

4

former employee of the Company has ever been entitled to post-employment medical, life or welfare benefits. Except as set forth on Schedule 3.10(b), no employee or former employee of the Company is entitled to severance benefits.

(c)     For purposes of this Section 3.10, the following terms have the following meanings:

"Employee Benefit Plan(s)" means any and all U.S. "employee pension benefit plans" (as defined in Section 3(2) of ERISA, whether or not U.S. law applies), "employee welfare benefit plans" (as defined in Section 3(1) of ERISA, whether or not U.S. law applies) and all other benefit plans (including all employment, bonus, deferred compensation, part-time, incentive compensation, stock ownership, stock purchase, stock appreciation, restricted stock, stock option, "phantom" stock, performance, stock bonus, paid time off, perquisite, fringe benefit, vacation, cafeteria and severance agreements, all plans and agreements relating to a change of control of the Company, all termination agreements, all stay bonuses, incentive bonuses, merger or acquisition success bonuses or payments, all split-dollar life insurance plans, programs, policies and agreements, and all other plans, programs, policies, arrangements and understandings (whether or not legally binding) whether or not subject to the provisions of ERISA) that are, or in the past six years have been, maintained or contributed to, or required to be maintained or contributed to, by the Company, the Seller or an ERISA Affiliate for the benefit of any current or former employee, consultant or contractor of the Company, the Seller or any ERISA Affiliate.

"ERISA Affiliate" means any person, trade or business that is under common control with the Company or Seller within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA.

4.     Representations and Warranties of the Purchaser. The Purchaser represents and warrants to the Seller as follows:

4.1     Authority. The Purchaser has the requisite power, legal capacity and authority to enter into and perform its obligations under this Agreement and all agreements and documents contemplated by this Agreement to be executed and delivered by it, and to consummate the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by the Purchaser and constitutes the legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms.

4.2     Knowledge and Access to Information. Purchaser (a) has consulted with independent legal counsel with respect to the negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby to the extent it has deemed necessary or advisable, (b) has been able to obtain such financial and business information concerning the Company as it deems advisable in making the decision to purchase the Shares pursuant to this Agreement, (c) by reason of its knowledge and experience in financial and business matters, and

the assistance and advice available to it, is sufficiently knowledgeable and experienced in financial and business matters to make the decision to purchase the Shares, and (d) in making said decision, has not relied upon any warranty, representation, agreement, statement or advice of Seller or Seller Parent or any of any their affiliates, directors, officers, employees, shareholders, agents or representatives, as the case may be, not explicitly set forth in this Agreement. Purchaser has no knowledge that the representations and warranties in Section 3 of this Agreement are not true and correct.

5.    Tax Matters.    The Seller shall be liable for and shall indemnify the Purchaser and the Company for all taxes of the Company for taxable periods ending on or before the Closing. The Purchaser shall cause the Company to prepare and file all tax returns of the Company due after the Closing; provided that Seller shall initially prepare, as part of its consolidated return, all tax returns of the Company that are due after the Closing and that relate to taxable periods ending on or before the Closing. Such returns shall be prepared and filed on a timely basis and on a basis consistent with existing practices and procedures for preparing such returns. In the event the Seller is liable for taxes due in connection with any tax return filed after the Closing, the Seller may review such return and upon agreement with its preparation, shall pay the amount of such liability to the Company promptly upon request. The Purchaser, the Company and the Seller shall provide each other with such reasonable assistance as may reasonably be requested by the others in connection with the preparation of any return or report of taxes, any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to liabilities for taxes. The Seller shall control any examination, investigation, audit or other proceeding in respect of any tax return which relates to a period prior to Closing, and the Seller shall have the right to review any tax return which creates tax liability for which the Seller is responsible. The Purchaser and the Company shall not settle or otherwise resolve any issue relating to any tax return if the Seller is liable for any resulting taxes without the permission of the Seller (which will not be unreasonably withheld or delayed).

6.    Indemnification.

    6.1    By the Seller.    The Seller and Seller Parent jointly and severally agree to indemnify and hold harmless the Company, Purchaser, and their respective affiliates from and against any and all claims, liabilities, obligations, losses, fines, costs or damages (collectively, "Losses") resulting from:

        (i)    a breach of any representation or warranty contained in Section 3 of this Agreement, other than any inaccuracy of which Purchaser has previous knowledge;

        (ii)    a failure of the Seller to perform any covenant or agreement made or contained in this Agreement;

        (iii)    any liabilities or obligations of the Company or its subsidiaries that relate to or arise against Company or its subsidiaries as of or prior to Closing, or that otherwise relate to or arise out of Company's ownership of its assets and properties (including the Assets) or Company's operations before the Closing, including with respect to any product manufactured or shipped by Company or its

6

subsidiaries or any service provided by Company or its subsidiaries prior to Closing; or

(iv)   any Employee Benefit Plan;

provided that: the indemnification obligations of Seller are subject to the survivability periods set forth in Section 6.5 below. Purchaser agrees that in the event of any breach giving rise to an indemnification obligation of Seller hereunder, Purchaser shall take and cause its affiliates to take, or cooperate with Seller, if so requested by Seller, in order to take, all reasonable measures to mitigate the consequences of the related breach (including taking steps to prevent any contingent liability from becoming an actual liability). Purchaser acknowledges and agrees that its sole and exclusive remedy with respect to any and all claims relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this Section 6.

6.2   By Purchaser. The Purchaser covenants and agrees to defend, indemnify and hold harmless the Seller from and against, and pay or reimburse the Seller for, any and all Losses resulting from or arising out of:

(i)   any inaccuracy in any representation or warranty by the Purchaser made or contained in this Agreement;

(ii)   any failure of the Purchaser to perform any covenant or agreement made or contained in this Agreement; or

(iii)   any liabilities or obligations of the Company that relate to or arise against Company after the Closing, or that otherwise relate to or arise out of Company's ownership of the Assets or Company's operations after the Closing, including with respect to any product manufactured or shipped by Company or its subsidiaries or any service provided by Company or its subsidiaries after to Closing.

6.3   Indemnification Procedures. In the case of any claim asserted by a third party against a party entitled to indemnification under this Agreement (the "Indemnified Party"), notice shall be given by the Indemnified Party to the party required to provide indemnification (the "Indemnifying Party") promptly, after such Indemnified Party has knowledge of any claim as to which indemnity may be sought; provided that failure to give such notification on a timely basis shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been harmed as a result of such failure. Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, within five business days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the third party claim. The Indemnifying Party shall elect whether or not to assume the defense of any claim or any litigation resulting therefrom, provided that (a) the Indemnifying Party acknowledges its obligation to indemnify the Indemnified Party in writing and (b) the Indemnified Party may observe in such defense at such Indemnified Party's expense, it being understood, however, that the Indemnifying Party shall control such defense. If the Indemnifying Party elects to defend such third-party claim or demand, the Indemnified Party shall make available to the Indemnifying Party and its agents and representatives all records and

7

other materials which are reasonably required in the defense of such third-party claim or demand and shall otherwise cooperate with, and assist the Indemnifying Party in the defense of, such third-party claim or demand, and so long as the Indemnifying Party is defending such third-party claim in good faith (as adjudicated by a court of competent jurisdiction), the Indemnifying Party shall not pay, settle or compromise such third-party claim or demand. If the Indemnifying Party does not elect to defend such third-party claim or demand or does not defend such third-party claim or demand in good faith (as adjudicated by a court of competent jurisdiction), the Indemnified Party shall have the right, in addition to any other right or remedy it may have hereunder, at the Indemnifying Party's expense, to defend such third-party claim or demand; provided, however, that (i) the Indemnified Party shall not pay, settle or compromise such third-party claim or demand without the consent of the Indemnifying Party, such consent not to be unreasonably withheld, (ii) the Indemnified Party shall not have any obligation to participate in the defense of, or defend, any such third-party claim or demand, and (iii) the Indemnified Party's defense of or its participation in the defense of any such third-party claim or demand shall not in any way diminish or lessen the obligations of the Indemnifying Party under the agreements of indemnification set forth in this Section 6.

6.4     Determination of Losses. The amount of any and all Losses under this Section 6 shall be determined net of any amounts recovered or recoverable by the Indemnified Party under insurance policies, indemnities or other reimbursement arrangements with respect to such Losses. No "multiple of profits" or "multiple of cash flows" or similar methodology shall be used in calculating the amount of any Losses. Any indemnity payment under this Agreement shall be treated as an adjustment to the Purchase Price for tax purposes.

6.5     Survival of Representations, Warranties and Covenants. The representations and warranties in this Agreement shall survive the Closing until the fifth anniversary of the Closing; provided, however, that the representations and warranties in Sections 3.2 and 3.3 shall survive indefinitely and the representations and warranties of Seller with respect to any Employee Benefit Plan shall survive until the end of any applicable statute of limitations. The covenants set forth in this Agreement shall survive until fulfilled or waived.

7.     Other Terms.

7.1     Sole Inclusion of Assets as of the Closing; Power of Attorney.

(a)     Company shall distribute or assign all assets (other than the Assets) of the Company to Seller as of or prior to the Closing, and Seller shall assume all of the liabilities of the Company existing as of the Closing. In the event any Company asset (other than the Assets) or any Company liability relating to the period prior to Closing remains with the Company at the Closing, each of Seller and Purchaser shall (and Purchaser shall direct Company to) do, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as may required to transfer or assign such assets (other than the Assets) and liabilities relating to the period prior to Closing to Seller and to otherwise ensure that Purchaser only acquires the Assets of the Company and assumes none of the liabilities of the Company which relate to the period prior to Closing.

8

(b)    In furtherance of Section 7.1(a), Purchaser hereby grants a power of attorney to Seller, Seller Parent and their respective officers to represent Company in their respective capacity in any transaction required to transfer or assign any asset (other than the Assets) or liability relating to the period prior to Closing to Seller and to otherwise ensure that as of the Closing, the Company will own only the Assets, and Seller will have assumed all liabilities of the Company which relate to the period prior to Closing, including, but not limited to, the execution of documents and the taking of all necessary actions in connection therewith.

7.2    Assets.

(a)    Purchaser shall market and offer for sale the Assets, including selling the Assets via an auction conducted at Seller's Pleasant Prairie Wisconsin Plastic Plant by Purchaser's affiliate, Stopol Auctions LLC and/or via pre-auction sales. Seller makes no representation as to the quality or condition of the Assets, which shall be acquired by Purchaser in their "as-is, where-is" condition at Closing.

(b)    Purchaser will use its best efforts to remove or cause the Company to remove the Assets from Seller's Pleasant Prairie Wisconsin Plastic Plant as soon as possible after the Closing. In any event, Purchaser will have removed or caused the Company to have removed all the Assets from GBC's Pleasant Prairie Wisconsin Plastic Plant by February 29, 2008.

(c)    Prior to the removal of the Assets, Seller will store the Assets at Seller's expense at Seller's Pleasant Prairie Wisconsin Plastic Plant; provided however, Seller shall insure such stored Assets with a deductible of $250,000. Purchaser shall obtain insurance covering the initial $250,000 of such stored Assets and shall deliver to Seller a certificate of insurance reflecting such insurance coverage at Closing for the Assets.

(d)    In the event the Note has not been fully paid on or prior to February 29, 2008, and if Purchaser is directed to do so by Seller in writing, Purchaser shall cause Company to transfer all the remaining Assets to Seller or its designee. The proceeds obtained by Seller thereafter from its sale of the remaining Assets shall be used to offset the amount then due and payable under the Note and the balance shall be paid as directed by Seller.

7.3    Transition.

(a)    Immediately after Closing, Purchaser will change the Company's name so that the word "VeloBind" no longer appears in its corporate name. Notwithstanding the foregoing, Seller agrees that in connection with Purchaser's marketing efforts, Purchaser may disclose to prospective purchasers that the Assets constitute equipment formerly owned or used by "VeloBind" and/or for "General Binding Corporation."

(b)    Following the Closing, Seller will give Purchaser and the Company reasonable access to Seller's Pleasant Prairie Wisconsin Plastic Plant and to the Assets in connection with Purchaser's marketing efforts under Section 7.2(a), including without limitation, allowing prospective purchasers to examine and test the Assets (without

producing any products), and the preparation for and conduct of the auction by Stopol Auctions LLC. Upon a sale of such Assets, Seller will reasonably assist Purchaser and the Company with disconnecting the relevant Assets and preparing such Assets for removal.

7.4    COBRA.  Seller shall be solely responsible for the continuation health coverage obligations (including all notice requirements) imposed by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") with respect to all employees, former employees, their dependents and other qualified beneficiaries who are eligible for or receiving COBRA coverage on or prior to the Closing Date or as a result of the transactions described in this Agreement. In the event the Seller fails to comply with these obligations, Seller shall indemnify Purchaser for any and all financial liability it or Company may incur as a result of such failure.

7.5    Employee Benefits.  Seller shall be solely responsible for the payment of all liabilities and benefits accrued under any employee pension benefit plan, any employee welfare benefit plan, any severance plan, any retiree medical plan and any other Employee Benefit Plan maintained by Seller, Company or any ERISA Affiliate, for any employee or former employee of the Company, or dependent of such employee, which was earned, accrued or in pay status as of the Closing. In the event that Company or Purchaser has any liability for any such benefits, Seller shall immediately indemnify Company or Purchaser for any such liability. In addition, Seller and Company shall amend all Employee Benefit Plans in which Company participates to cease such participation as of the day immediately preceding the Closing.

7.6    Confidentiality.  The Purchaser acknowledges that all information provided to it and any of its affiliates, agents and representatives by the Seller, the Company, their respective subsidiaries and their respective affiliates, agents and representatives, including without limitation, the terms of this Agreement, is confidential and shall not be used by Purchaser other than in connection with consummating the contemplated transactions hereunder. Purchaser shall keep all such information confidential, regardless of whether the Closing occurs or not.

7.7    Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings between such persons with respect thereto. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

7.8    Expenses.  The Seller, on the one hand, and the Purchaser, on the other hand, shall bear their respective expenses, costs and fees (including attorneys' fees) in connection with the transactions contemplated hereby, including the preparation, execution and delivery of this Agreement and compliance herewith.

7.9    Counterparts.  This Agreement may be executed in one or more counterparts (including via facsimile), each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

7.10    Successors and Assigns.  This Agreement is binding upon and inures to the benefit of the parties to this Agreement and their respective successors and assigns, but is not

assignable without the prior written consent of the other party, which consent shall not be unreasonably withheld.

7.11 <u>Governing Law</u>. The validity, interpretation and effect of this Agreement shall be governed exclusively by the laws of the State of Illinois, excluding the "conflict of laws" rules thereof.

7.12 <u>Notices</u>. Any notice or other communication provided for by this Agreement must be in writing, and sent by facsimile transmission (electronically confirmed), delivered in person, mailed by first class registered or certified mail, postage prepaid, or sent by Federal Express or other overnight courier of national reputation, addressed as follows:

If to Purchaser:

Mr. Neil E. Kruschke Jr.
Stopol, Inc.
31875 Solon Road
Solon, OH  44139
Fax:  216-498-4001

With a copy to:

Ulmer & Berne LLP
1660 W. 2nd Street – Suite 1100
Cleveland, Ohio 44113
Attention:  John C. Goheen, Esq.
Fax:  216-583-7007

If to the Seller:

Steve Rubin
Senior Vice President, Secretary, and General Counsel
ACCO Brands Corporation
300 Tower Parkway
Lincolnshire, IL  60069
Fax:  (847) 484-3010

with a copy to:

Vedder, Price, Kaufman & Kammholz, P.C.
222 N. LaSalle Street, Suite 2400
Chicago, IL  60601
Attention: Jack Obiala
Fax:  (312) 609-6005

11

or to such other address with respect to a party as such party notifies the other parties in writing as above provided.

7.13    <u>Severability</u>.    Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

7.14    <u>Waiver of Jury Trial</u>.    THE PARTIES HERETO (BY ACCEPTANCE OF THE BENEFITS HEREUNDER) KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY THE RIGHT EITHER OR ANY MAY HAVE TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDINGS BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, IN WHICH THE PARTIES HERETO ARE ADVERSE TO ONE ANOTHER.

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement as of the day and year first above written.

**GENERAL BINDING CORPORATION**

By: _____
      Name: Gave Rubin
      Title: Vice President + Secretary

**STOPOL, INC.**

By: _____
      Name:
      Title:

SOLELY FOR PURPOSES OF SECTION 3
AND SECTION 6.1 ABOVE

**ACCO Brands Corporation**

By: _____
      Name: Gave Rubin
      Title: Senior Vice President +
               Secretary

12

or to such other address with respect to a party as such party notifies the other parties in writing as above provided.

7.13   Severability.   Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

7.14   Waiver of Jury Trial.   THE PARTIES HERETO (BY ACCEPTANCE OF THE BENEFITS HEREUNDER) KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY THE RIGHT EITHER OR ANY MAY HAVE TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDINGS BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, IN WHICH THE PARTIES HERETO ARE ADVERSE TO ONE ANOTHER.

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement as of the day and year first above written.

**GENERAL BINDING CORPORATION**

By:_____
    Name:
    Title:

**STOPOL, INC.**

By:_____
    Name: Neil E. Kruschke. Jr.
    Title: CEO

SOLELY FOR PURPOSES OF SECTION 3
AND SECTION 6.1 ABOVE

**ACCO Brands Corporation**

By:_____
    Name:
    Title:

12

## **EXHIBIT A**

FORM OF NOTE

See attached.

**EXHIBIT B**

ASSETS

See attached.

## SCHEDULE 3.10(a)

1. VeloBind Incorporated and General Binding Corporation 2006 Pleasant Prairie Plastics Plant Severance Benefits Plan effective July 21, 2006.

2. General Binding 401(k) Retirement Savings Plan, effective as of January 1, 2005.

3. General Binding Corporation Group Benefit Plan, effective as of January 1, 2003.

4. General Binding Corporation Management Incentive Compensation Plan.

5. Amended and Restated General Binding Corporation 2001 Stock Incentive Plan for Employees dated February 15, 2002.

6. 2006 Amended and Restated ACCO Brands Corporation Incentive Plan.

7. General Binding Corporation Severance Plan for Certain Hourly-Paid Employees, effective as of June 25, 2007.

8. General Binding Corporation Severance Plan, effective as of June 25, 2007.

## SCHEDULE 3.10(b)

Employee Pension Benefit Plans:

1. ACCO Brands Corporation Pension Plan for Salaried and Certain Hourly Paid Employees Effective as of December 31, 2001, as amended.

2. Pace Union-Management Pension Fund, dated June 2003.

3. ACCO World Corporation Supplemental Retirement Plan, Effective as of December 1998, as amended, and the ACCO World Corporation Trust Agreement, dated as of August 2002 among ACCO, The Northern Trust Company, as Trustee, and Hewitt Associates, LLC, as Recordkeeper.

4. The Wilson Jones Company, ACME Visible Records, Inc., Perma Products Company, and Swingline, Inc. Employee IRA plan.

5. ACCO Brands Corporation 401(k) Plan effective as of August 16, 2005, as amended.

Multiemployer Plans:

1. Pace Union-Management Pension Fund, dated June 2003.

Plans providing for post-employment medical, life or welfare benefits:

1. ACCO Brands, Inc., Consolidated Health and Welfare Plan, Amended and Restated Effective January 1, 2006.

2. General Binding Corporation Group Benefit Plan, effective as of January 1, 2003.

Employees and former employee of the Company entitled to post-employment medical, life or welfare benefits:

| Name | Retiree Health Start Date | Retiree Health End Date |
|---|---|---|
| Hughey P. Nailor | 07/01/07 | 06/30/13 |
| Tomas Castro | 12/01/07 | 03/30/15 |
| Joseph Loncsar | 02/02/07 | Subsidized COBRA coverage will end 10/31/07 when the employee reaches 65 |
| Gilberto Marquez | 01/01/08 | 12/31/08 |

Employees and former Employees of the Company entitled to severance benefits:

| Name | Pay From Date | Pay Through Date |
|---|---|---|
| Bruce Maas | 01/04/07 | 08/24/07 |
| Gabriel Hernandez | 02/05/07 | 09/14/07 |
| Earnest Lollar | 01/05/07 | 10/05/07 |
| Tomas Castro | 02/05/07 | 10/12/07 |
| German Garcia | 02/05/07 | 11/09/07 |
| Michael Kliewer | 02/05/07 | 11/09/07 |
| Joseph Loncsar | 02/05/07 | 11/09/07 |
| Gilberto Marquez | 02/26/07 | 11/30/07 |
| Anthony Meitus | 04/30/07 | 02/05/08 |
| Jerry McCarty | 07/02/07 | 04/09/08 |
| Mike Kiser | 07/02/07 | 09/03/07 |

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of November 30, 2007 by and between General Binding Corporation ("Seller") and Stopol, Inc. (the "Purchaser"), and for purposes of Sections 3 and 6.1 hereof only, ACCO Brands Corporation, a Delaware corporation, the parent company of Seller ("Seller Parent").

### R E C I T A L S

A.    Seller owns 100% of the outstanding shares of capital stock ("Shares") of VeloBind Incorporated, a Delaware corporation (the "Company"); and

B.    The Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, all of the Shares upon the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.    Sale and Purchase of the Shares.

1.1    Sale and Purchase.  At the Closing, Seller shall sell, assign and transfer to the Purchaser all of the Shares, and the Purchaser shall purchase from Seller all of the Shares.

1.2    Purchase Price.  The purchase price to be paid by the Purchaser to the Seller in exchange for the Shares (the "Purchase Price") shall have a fixed portion and a contingent portion. The fixed portion of the Purchase Price shall be $965,497. The contingent portion of the Purchase Price shall be an amount equal to 25% of the Company's proceeds from the auction referred to in Section 7.2(a) in excess of $1,347,500.  The Company's proceeds from said auction shall not include the proceeds from any pre-auction sales, any buyer's premiums paid by successful bidders at the auction, and/or any sales taxes collected with respect to items sold at said auction.

1.3    Payment.  The $965,497 fixed portion of the Purchase Price shall be paid to the Seller by the Purchaser as follows:  at the Closing, by delivery of a promissory note in a form attached hereto as Exhibit A (the "Note") payable to Seller on or before February 29, 2008 in an amount equal to the $965,497 fixed portion of the Purchase Price.  Prior to February 29, 2008, Purchaser shall make periodic payments to Seller on the Note as it sells the Assets (as defined in Section 3.4) at the rate of eighty percent (80%) of the gross sales proceeds of each item of the Assets that Purchaser sells ("Subsequent Sale").  The contingent portion, if any, of the Purchase Price shall be paid to the Seller by the Purchaser within 30 banking days from the last day of the auction referred to in Section 7.2(a).

1.4    Grant of Security Interest.

(a)    For value received, Purchaser grants and will cause Company to grant a first priority security interest to Seller in all of the Assets.  The security interest granted is given as collateral security for the payment of the amount due under the Note.

(b)    Purchaser shall at all reasonable times allow Seller, by or through any of its agents, to examine and inspect the Assets. Upon removal of any Assets from Seller's premises and until the consummation of a Subsequent Sale for such Assets, Purchaser shall have and maintain insurance against customary risks at least equal to a reasonable, nonliquidation fair market value with respect to such Assets.

(c)    Purchaser shall (and shall direct Company to) do, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as Seller may require, to more completely vest in and assure to Seller its rights hereunder and in or to the Assets. Seller is expressly allowed to file a UCC-1 financing statement to perfect its security interest in the Assets.

(d)    Upon a material breach of the terms herein by Purchaser, including a payment default under Section 1.3, and at any time thereafter, Seller shall have the rights and remedies of a secured party under the Uniform Commercial Code as in effect from time to time in the State of Illinois, and all other rights and remedies available under applicable law or in equity.

(e)    Seller shall release its security interest in the specific Assets being sold in connection with a Subsequent Sale until the Purchase Price is paid in full, at which time the Seller shall release its security interest in all of the remaining Assets.

2.    The Closing.

2.1    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall be held on the date first set forth above at the offices of Seller.

2.2    Closing Deliveries.

(a)    By the Seller.  At the Closing, Seller shall deliver to the Purchaser (i) the stock certificate(s) representing all of the Shares, with duly executed stock powers attached in proper form for transfer to the Purchaser, (ii) the minute books and stock record books for the Company, (iii) the resignations of all of the Company's officers and directors pursuant to Section 3.7(a), (iv) the amendments to the Employee Benefit Plans required pursuant to Section 7.5 (and all necessary or appropriate corporate resolutions authorizing such amendments), (v) workpapers or other documents reasonably satisfactory to Purchaser's counsel reflecting the tax basis in each of the Assets as of the Closing, and (vi) such other instruments or documents as are, in the opinion of the Purchaser's counsel, reasonably and customarily required.

(b)    By the Purchaser.  At the Closing, the Purchaser shall deliver, or cause to be delivered, to Seller (i) the Note, (ii) a certificate of insurance pursuant to Section 7.2(c) and (iii) such other instruments or documents as are, in the opinion of the Seller's counsel, reasonably and customarily required.

3.    Representations and Warranties of the Seller.    Seller and Seller Parent jointly and severally represent and warrant to the Purchaser:

2

1619546v10/21033-27

3.1    Authority.  The Seller has the requisite power, legal capacity and authority to enter into and perform its obligations under this Agreement and all agreements and documents contemplated by this Agreement and to consummate the transactions contemplated by this Agreement and such action has been duly authorized by all necessary corporate action by Seller, including due and proper approval from Seller's board of directors.  This Agreement has been duly executed and delivered by the Seller and constitutes the legal, valid and binding obligation of the Seller, enforceable in accordance with its terms and does not violate or conflict with or result in a breach of any agreement or obligation to or by which Seller is bound.

3.2    Title to Shares.  Seller is the record and beneficial owner of the Shares and has the power, right and authority to sell, assign, transfer and deliver to the Purchaser the Shares.

3.3    Capitalization.

(a)    On the date hereof, the Company's authorized capitalization consists of one hundred (100) shares of common stock, par value $0.50 per share.

(b)    The Shares constitute 100% of the shares of capital stock of the Company that are issued and outstanding.  The Company does not hold any of its shares of capital stock in its treasury.

(c)    The Shares are validly issued, fully paid and nonassessable.  The Shares were issued in accordance and compliance with all securities and other laws.

(d)    Seller has good and valid title to the Shares, free and clear of any lien, pledge, encumbrance, option, right of first refusal, claim or restriction.

(e)    The Company is a corporation duly organized, validly existing and in good standing under the laws of Delaware, with full corporate power and authority to own its assets.

3.4    Assets.  As of the Closing, the only assets of the Company are the items solely set forth on Exhibit B hereto (the "Assets").  The Company has good and marketable title to the Assets.  The Assets are not subject to any lien or encumbrance.  All of the Assets are located at Seller's Pleasant Prairie Wisconsin Plastic Plant.

3.5    No Liabilities.  As of the Closing, the Company has no liabilities, whether known or unknown and whether absolute, contingent, accrued or otherwise.  As of the Closing, the Company does not guarantee any obligations of the Seller or its affiliates.

3.6    Tax Basis, etc.  As of October 31, 2007, the Company's tax basis in the Assets was no less than $202,499.  As of the Closing, the Company has an alternative minimum tax credit ("AMT credit") of no less than $92,000.  As of the Closing, no state or local income taxes would apply to any income or gain resulting from any sale by the Company of any Asset other than Wisconsin income tax at the rate of 7.9%.

3

3.7    <u>Employees, Officers and Directors</u>.    As of the Closing, (a) all of the Company's officers and directors have resigned and (b) the Company has no employees or independent contractors.

3.8    <u>No Subsidiaries</u>.    As of the Closing, the Company has no subsidiaries.

3.9    <u>No Litigation or Proceedings</u>.    There exists no litigation, investigation, action, suit, claim or proceeding (the "Actions") now pending or, to the best of Seller's knowledge, threatened (or existing but unasserted) before any court, administrative or regulatory body, governmental authority, arbitration or mediation panel or similar body, to which Seller or Company is a part arising out of the Company's business or the Company's properties or assets or which is likely to prevent the consummation of the transactions contemplated by this Agreement. There is no outstanding order, notice, writ, injunction or decree of any court, governmental agency, or government against or affecting the Company or its business, properties or assets. There has been no Action to which Seller or the Company was a party affecting the Company or its business, properties or assets that has been revolved within the past three years.

3.10    <u>Employee Benefits Matters</u>.

(a)    Except as set forth on Schedule 3.10(a) Company does not and has not ever in the six-year period preceding the Closing maintained or contributed to any Employee Benefit Plan and Company does not and will not in the future have any liability with respect to any Employee Benefit Plan. In addition in the six-year period preceding the Closing, Company has not contributed to any Employee Pension Benefit Plan (as defined in Section 3(2) of ERISA), other than a defined contribution plan. In the six-year period preceding Closing all contributions required to be made by Company to any Employee Benefit Plan have been timely made. Each Employee Benefit Plan that is intended to be qualified under Code Section 401(a) has received a favorable determination letter from the Internal Revenue Service as to the plan's tax-qualified status, and there is no fact or circumstance that could reasonably be expected to adversely affect the tax-qualified status of such plan. Each Employee Benefit Plan has been administered in all material respects in accordance with its terms and applicable law.

(b)    Except as set forth on Schedule 3.10(b), none of the Company, Seller or any ERISA Affiliate has in the six-year period preceding the Closing sponsored or maintained an Employee Pension Benefit Plan subject to Title IV of ERISA or the minimum funding requirements of Section 412 of the Code. Except as set forth on Schedule 3.10(b), none of the Company, Seller or any ERISA Affiliate has in the six-year period preceding the Closing maintained, contributed to, been obligated to contribute to, or incurred any Liability with respect to any "multiemployer plan" (as defined in Section 3(37) of ERISA). No Employee or former Employee of Company has accrued a benefit or has any entitlement to benefits under an Employee Pension Benefit Plan sponsored by Company, Seller or an ERISA Affiliate which is subject to Title IV of ERISA or under any multiemployer plan contributed to at any time by Company, Seller or any ERISA Affiliate. Except as set forth on Schedule 3.10(b), no Employee Benefit Plan maintained by Seller or any ERISA Affiliate provides for post-employment medical, life or welfare benefits, except as required by Section 601 of ERISA. No employee or

4

former employee of the Company has ever been entitled to post-employment medical, life or welfare benefits.  Except as set forth on Schedule 3.10(b), no employee or former employee of the Company is entitled to severance benefits.

(c)    For purposes of this Section 3.10, the following terms have the following meanings:

"Employee Benefit Plan(s)" means any and all U.S. "employee pension benefit plans" (as defined in Section 3(2) of ERISA, whether or not U.S. law applies), "employee welfare benefit plans" (as defined in Section 3(1) of ERISA, whether or not U.S. law applies) and all other benefit plans (including all employment, bonus, deferred compensation, part-time, incentive compensation, stock ownership, stock purchase, stock appreciation, restricted stock, stock option, "phantom" stock, performance, stock bonus, paid time off, perquisite, fringe benefit, vacation, cafeteria and severance agreements, all plans and agreements relating to a change of control of the Company, all termination agreements, all stay bonuses, incentive bonuses, merger or acquisition success bonuses or payments, all split-dollar life insurance plans, programs, policies and agreements, and all other plans, programs, policies, arrangements and understandings (whether or not legally binding) whether or not subject to the provisions of ERISA) that are, or in the past six years have been, maintained or contributed to, or required to be maintained or contributed to, by the Company, the Seller or an ERISA Affiliate for the benefit of any current or former employee, consultant or contractor of the Company, the Seller or any ERISA Affiliate.

"ERISA Affiliate" means any person, trade or business that is under common control with the Company or Seller within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA.

4.    Representations and Warranties of the Purchaser.  The Purchaser represents and warrants to the Seller as follows:

4.1    Authority.  The Purchaser has the requisite power, legal capacity and authority to enter into and perform its obligations under this Agreement and all agreements and documents contemplated by this Agreement to be executed and delivered by it, and to consummate the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by the Purchaser and constitutes the legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms.

4.2    Knowledge and Access to Information.  Purchaser (a) has consulted with independent legal counsel with respect to the negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby to the extent it has deemed necessary or advisable, (b) has been able to obtain such financial and business information concerning the Company as it deems advisable in making the decision to purchase the Shares pursuant to this Agreement, (c) by reason of its knowledge and experience in financial and business matters, and

5

the assistance and advice available to it, is sufficiently knowledgeable and experienced in financial and business matters to make the decision to purchase the Shares, and (d) in making said decision, has not relied upon any warranty, representation, agreement, statement or advice of Seller or Seller Parent or any of their affiliates, directors, officers, employees, shareholders, agents or representatives, as the case may be, not explicitly set forth in this Agreement. Purchaser has no knowledge that the representations and warranties in <u>Section 3</u> of this Agreement are not true and correct.

5.    <u>Tax Matters</u>.   The Seller shall be liable for and shall indemnify the Purchaser and the Company for all taxes of the Company for taxable periods ending on or before the Closing. The Purchaser shall cause the Company to prepare and file all tax returns of the Company due after the Closing; provided that Seller shall initially prepare, as part of its consolidated return, all tax returns of the Company that are due after the Closing and that relate to taxable periods ending on or before the Closing. Such returns shall be prepared and filed on a timely basis and on a basis consistent with existing practices and procedures for preparing such returns. In the event the Seller is liable for taxes due in connection with any tax return filed after the Closing, the Seller may review such return and upon agreement with its preparation, shall pay the amount of such liability to the Company promptly upon request. The Purchaser, the Company and the Seller shall provide each other with such reasonable assistance as may reasonably be requested by the others in connection with the preparation of any return or report of taxes, any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to liabilities for taxes. The Seller shall control any examination, investigation, audit or other proceeding in respect of any tax return which relates to a period prior to Closing, and the Seller shall have the right to review any tax return which creates tax liability for which the Seller is responsible. The Purchaser and the Company shall not settle or otherwise resolve any issue relating to any tax return if the Seller is liable for any resulting taxes without the permission of the Seller (which will not be unreasonably withheld or delayed).

6.    <u>Indemnification</u>.

       6.1    <u>By the Seller</u>.   The Seller and Seller Parent jointly and severally agree to indemnify and hold harmless the Company, Purchaser, and their respective affiliates from and against any and all claims, liabilities, obligations, losses, fines, costs or damages (collectively, "<u>Losses</u>") resulting from:

                      (i)      a breach of any representation or warranty contained in <u>Section 3</u> of this Agreement, other than any inaccuracy of which Purchaser has previous knowledge;

                      (ii)     a failure of the Seller to perform any covenant or agreement made or contained in this Agreement;

                      (iii)    any liabilities or obligations of the Company or its subsidiaries that relate to or arise against Company or its subsidiaries as of or prior to Closing, or that otherwise relate to or arise out of Company's ownership of its assets and properties (including the Assets) or Company's operations before the Closing, including with respect to any product manufactured or shipped by Company or its

6

subsidiaries or any service provided by Company or its subsidiaries prior to Closing; or

(iv)    any Employee Benefit Plan;

provided that: the indemnification obligations of Seller are subject to the survivability periods set forth in Section 6.5 below. Purchaser agrees that in the event of any breach giving rise to an indemnification obligation of Seller hereunder, Purchaser shall take and cause its affiliates to take, or cooperate with Seller, if so requested by Seller, in order to take, all reasonable measures to mitigate the consequences of the related breach (including taking steps to prevent any contingent liability from becoming an actual liability). Purchaser acknowledges and agrees that its sole and exclusive remedy with respect to any and all claims relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this Section 6.

6.2    By Purchaser. The Purchaser covenants and agrees to defend, indemnify and hold harmless the Seller from and against, and pay or reimburse the Seller for, any and all Losses resulting from or arising out of:

(i)    any inaccuracy in any representation or warranty by the Purchaser made or contained in this Agreement;

(ii)    any failure of the Purchaser to perform any covenant or agreement made or contained in this Agreement; or

(iii)    any liabilities or obligations of the Company that relate to or arise against Company after the Closing, or that otherwise relate to or arise out of Company's ownership of the Assets or Company's operations after the Closing, including with respect to any product manufactured or shipped by Company or its subsidiaries or any service provided by Company or its subsidiaries after to Closing.

6.3    Indemnification Procedures. In the case of any claim asserted by a third party against a party entitled to indemnification under this Agreement (the "Indemnified Party"), notice shall be given by the Indemnified Party to the party required to provide indemnification (the "Indemnifying Party") promptly, after such Indemnified Party has knowledge of any claim as to which indemnity may be sought; provided that failure to give such notification on a timely basis shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been harmed as a result of such failure. Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, within five business days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the third party claim. The Indemnifying Party shall elect whether or not to assume the defense of any claim or any litigation resulting therefrom, provided that (a) the Indemnifying Party acknowledges its obligation to indemnify the Indemnified Party in writing and (b) the Indemnified Party may observe in such defense at such Indemnified Party's expense, it being understood, however, that the Indemnifying Party shall control such defense. If the Indemnifying Party elects to defend such third-party claim or demand, the Indemnified Party shall make available to the Indemnifying Party and its agents and representatives all records and

7

other materials which are reasonably required in the defense of such third-party claim or demand and shall otherwise cooperate with, and assist the Indemnifying Party in the defense of, such third-party claim or demand, and so long as the Indemnifying Party is defending such third-party claim in good faith (as adjudicated by a court of competent jurisdiction), the Indemnified Party shall not pay, settle or compromise such third-party claim or demand. If the Indemnifying Party does not elect to defend such third-party claim or demand or does not defend such third-party claim or demand in good faith (as adjudicated by a court of competent jurisdiction), the Indemnified Party shall have the right, in addition to any other right or remedy it may have hereunder, at the Indemnifying Party's expense, to defend such third-party claim or demand; provided, however, that (i) the Indemnified Party shall not pay, settle or compromise such third-party claim or demand without the consent of the Indemnifying Party, such consent not to be unreasonably withheld, (ii) the Indemnified Party shall not have any obligation to participate in the defense of, or defend, any such third-party claim or demand, and (iii) the Indemnified Party's defense of or its participation in the defense of any such third-party claim or demand shall not in any way diminish or lessen the obligations of the Indemnifying Party under the agreements of indemnification set forth in this Section 6.

6.4     Determination of Losses. The amount of any and all Losses under this Section 6 shall be determined net of any amounts recovered or recoverable by the Indemnified Party under insurance policies, indemnities or other reimbursement arrangements with respect to such Losses. No "multiple of profits" or "multiple of cash flows" or similar methodology shall be used in calculating the amount of any Losses. Any indemnity payment under this Agreement shall be treated as an adjustment to the Purchase Price for tax purposes.

6.5     Survival of Representations, Warranties and Covenants. The representations and warranties in this Agreement shall survive the Closing until the fifth anniversary of the Closing; provided, however, that the representations and warranties in Sections 3.2 and 3.3 shall survive indefinitely and the representations and warranties of Seller with respect to any Employee Benefit Plan shall survive until the end of any applicable statute of limitations. The covenants set forth in this Agreement shall survive until fulfilled or waived.

7.     Other Terms.

7.1     Sole Inclusion of Assets as of the Closing; Power of Attorney.

(a)     Company shall distribute or assign all assets (other than the Assets) of the Company to Seller as of or prior to the Closing, and Seller shall assume all of the liabilities of the Company existing as of the Closing. In the event any Company asset (other than the Assets) or any Company liability relating to the period prior to Closing remains with the Company at the Closing, each of Seller and Purchaser shall (and Purchaser shall direct Company to) do, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as may required to transfer or assign such assets (other than the Assets) and liabilities relating to the period prior to Closing to Seller and to otherwise ensure that Purchaser only acquires the Assets of the Company and assumes none of the liabilities of the Company which relate to the period prior to Closing.

8

(b)     In furtherance of Section 7.1(a), Purchaser hereby grants a power of attorney to Seller, Seller Parent and their respective officers to represent Company in their respective capacity in any transaction required to transfer or assign any asset (other than the Assets) or liability relating to the period prior to Closing to Seller and to otherwise ensure that as of the Closing, the Company will own only the Assets, and Seller will have assumed all liabilities of the Company which relate to the period prior to Closing, including, but not limited to, the execution of documents and the taking of all necessary actions in connection therewith.

7.2     Assets.

(a)     Purchaser shall market and offer for sale the Assets, including selling the Assets via an auction conducted at Seller's Pleasant Prairie Wisconsin Plastic Plant by Purchaser's affiliate, Stopol Auctions LLC and/or via pre-auction sales.  Seller makes no representation as to the quality or condition of the Assets, which shall be acquired by Purchaser in their "as-is, where-is" condition at Closing.

(b)     Purchaser will use its best efforts to remove or cause the Company to remove the Assets from Seller's Pleasant Prairie Wisconsin Plastic Plant as soon as possible after the Closing.  In any event, Purchaser will have removed or caused the Company to have removed all the Assets from GBC's Pleasant Prairie Wisconsin Plastic Plant by February 29, 2008.

(c)     Prior to the removal of the Assets, Seller will store the Assets at Seller's expense at Seller's Pleasant Prairie Wisconsin Plastic Plant; provided however, Seller shall insure such stored Assets with a deductible of $250,000.  Purchaser shall obtain insurance covering the initial $250,000 of such stored Assets and shall deliver to Seller a certificate of insurance reflecting such insurance coverage at Closing for the Assets.

(d)     In the event the Note has not been fully paid on or prior to February 29, 2008, and if Purchaser is directed to do so by Seller in writing, Purchaser shall cause Company to transfer all the remaining Assets to Seller or its designee.  The proceeds obtained by Seller thereafter from its sale of the remaining Assets shall be used to offset the amount then due and payable under the Note and the balance shall be paid as directed by Seller.

7.3     Transition.

(a)     Immediately after Closing, Purchaser will change the Company's name so that the word "VeloBind" no longer appears in its corporate name.  Notwithstanding the foregoing, Seller agrees that in connection with Purchaser's marketing efforts, Purchaser may disclose to prospective purchasers that the Assets constitute equipment formerly owned or used by "VeloBind" and/or for "General Binding Corporation."

(b)     Following the Closing, Seller will give Purchaser and the Company reasonable access to Seller's Pleasant Prairie Wisconsin Plastic Plant and to the Assets in connection with Purchaser's marketing efforts under Section 7.2(a), including without limitation, allowing prospective purchasers to examine and test the Assets (without

9

producing any products), and the preparation for and conduct of the auction by Stopol Auctions LLC. Upon a sale of such Assets, Seller will reasonably assist Purchaser and the Company with disconnecting the relevant Assets and preparing such Assets for removal.

7.4    COBRA.  Seller shall be solely responsible for the continuation health coverage obligations (including all notice requirements) imposed by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") with respect to all employees, former employees, their dependents and other qualified beneficiaries who are eligible for or receiving COBRA coverage on or prior to the Closing Date or as a result of the transactions described in this Agreement. In the event the Seller fails to comply with these obligations, Seller shall indemnify Purchaser for any and all financial liability it or Company may incur as a result of such failure.

7.5    Employee Benefits.  Seller shall be solely responsible for the payment of all liabilities and benefits accrued under any employee pension benefit plan, any employee welfare benefit plan, any severance plan, any retiree medical plan and any other Employee Benefit Plan maintained by Seller, Company or any ERISA Affiliate, for any employee or former employee of the Company, or dependent of such employee, which was earned, accrued or in pay status as of the Closing. In the event that Company or Purchaser has any liability for any such benefits, Seller shall immediately indemnify Company or Purchaser for any such liability. In addition, Seller and Company shall amend all Employee Benefit Plans in which Company participates to cease such participation as of the day immediately preceding the Closing.

7.6    Confidentiality.  The Purchaser acknowledges that all information provided to it and any of its affiliates, agents and representatives by the Seller, the Company, their respective subsidiaries and their respective affiliates, agents and representatives, including without limitation, the terms of this Agreement, is confidential and shall not be used by Purchaser other than in connection with consummating the contemplated transactions hereunder. Purchaser shall keep all such information confidential, regardless of whether the Closing occurs or not.

7.7    Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings between such persons with respect thereto. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

7.8    Expenses.  The Seller, on the one hand, and the Purchaser, on the other hand, shall bear their respective expenses, costs and fees (including attorneys' fees) in connection with the transactions contemplated hereby, including the preparation, execution and delivery of this Agreement and compliance herewith.

7.9    Counterparts.  This Agreement may be executed in one or more counterparts (including via facsimile), each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

7.10    Successors and Assigns.  This Agreement is binding upon and inures to the benefit of the parties to this Agreement and their respective successors and assigns, but is not

10

assignable without the prior written consent of the other party, which consent shall not be unreasonably withheld.

  7.11 <u>Governing Law</u>. The validity, interpretation and effect of this Agreement shall be governed exclusively by the laws of the State of Illinois, excluding the "conflict of laws" rules thereof.

  7.12 <u>Notices</u>. Any notice or other communication provided for by this Agreement must be in writing, and sent by facsimile transmission (electronically confirmed), delivered in person, mailed by first class registered or certified mail, postage prepaid, or sent by Federal Express or other overnight courier of national reputation, addressed as follows:

    If to Purchaser:

    Mr. Neil E. Kruschke Jr.
    Stopol, Inc.
    31875 Solon Road
    Solon, OH 44139
    Fax: 216-498-4001


    With a copy to:

    Ulmer & Berne LLP
    1660 W. 2nd Street – Suite 1100
    Cleveland, Ohio 44113
    Attention: John C. Goheen, Esq.
    Fax: 216-583-7007

    If to the Seller:

    Steve Rubin
    Senior Vice President, Secretary, and General Counsel
    ACCO Brands Corporation
    300 Tower Parkway
    Lincolnshire, IL 60069
    Fax: (847) 484-3010

    with a copy to:

    Vedder, Price, Kaufman & Kammholz, P.C.
    222 N. LaSalle Street, Suite 2400
    Chicago, IL 60601
    Attention: Jack Obiala
    Fax: (312) 609-6005

11

or to such other address with respect to a party as such party notifies the other parties in writing as above provided.

7.13    Severability.    Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

7.14    Waiver of Jury Trial.    THE PARTIES HERETO (BY ACCEPTANCE OF THE BENEFITS HEREUNDER) KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY THE RIGHT EITHER OR ANY MAY HAVE TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDINGS BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, IN WHICH THE PARTIES HERETO ARE ADVERSE TO ONE ANOTHER.

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement as of the day and year first above written.

**GENERAL BINDING CORPORATION**

By: _____
Name: _Steve Rubin_
Title: _Vice President + Secretary_

**STOPOL, INC.**

By: _____
Name:
Title:

SOLELY FOR PURPOSES OF SECTION 3
AND SECTION 6.1 ABOVE

**ACCO Brands Corporation**

By: _____
Name: _Steve Rubin_
Title: _Senior Vice President +_
        _Secretary_

12

or to such other address with respect to a party as such party notifies the other parties in writing as above provided.

7.13   Severability.   Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

7.14   Waiver of Jury Trial.  THE PARTIES HERETO (BY ACCEPTANCE OF THE BENEFITS HEREUNDER) KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY THE RIGHT EITHER OR ANY MAY HAVE TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDINGS BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, IN WHICH THE PARTIES HERETO ARE ADVERSE TO ONE ANOTHER.

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement as of the day and year first above written.

**GENERAL BINDING CORPORATION**

By:_____
    Name:
    Title:

**STOPOL, INC.**

By:_____
    Name: Neil E. Kruschke. Jr
    Title: CEO

SOLELY FOR PURPOSES OF SECTION 3
AND SECTION 6.1 ABOVE

**ACCO Brands Corporation**

By:_____
    Name:
    Title:

1619546v10/21033-27

## **EXHIBIT A**

FORM OF NOTE

See attached.

# **EXHIBIT B**

ASSETS

See attached.

## SCHEDULE 3.10(a)

1. VeloBind Incorporated and General Binding Corporation 2006 Pleasant Prairie Plastics Plant Severance Benefits Plan effective July 21, 2006.

2. General Binding 401(k) Retirement Savings Plan, effective as of January 1, 2005.

3. General Binding Corporation Group Benefit Plan, effective as of January 1, 2003.

4. General Binding Corporation Management Incentive Compensation Plan.

5. Amended and Restated General Binding Corporation 2001 Stock Incentive Plan for Employees dated February 15, 2002.

6. 2006 Amended and Restated ACCO Brands Corporation Incentive Plan.

7. General Binding Corporation Severance Plan for Certain Hourly-Paid Employees, effective as of June 25, 2007.

8. General Binding Corporation Severance Plan, effective as of June 25, 2007.

## SCHEDULE 3.10(b)

Employee Pension Benefit Plans:

1.  ACCO Brands Corporation Pension Plan for Salaried and Certain Hourly Paid Employees Effective as of December 31, 2001, as amended.

2.  Pace Union-Management Pension Fund, dated June 2003.

3.  ACCO World Corporation Supplemental Retirement Plan, Effective as of December 1998, as amended, and the ACCO World Corporation Trust Agreement, dated as of August 2002 among ACCO, The Northern Trust Company, as Trustee, and Hewitt Associates, LLC, as Recordkeeper.

4.  The Wilson Jones Company, ACME Visible Records, Inc., Perma Products Company, and Swingline, Inc. Employee IRA plan.

5.  ACCO Brands Corporation 401(k) Plan effective as of August 16, 2005, as amended.

Multiemployer Plans:

1.  Pace Union-Management Pension Fund, dated June 2003.

Plans providing for post-employment medical, life or welfare benefits:

1.  ACCO Brands, Inc., Consolidated Health and Welfare Plan, Amended and Restated Effective January 1, 2006.

2.  General Binding Corporation Group Benefit Plan, effective as of January 1, 2003.

Employees and former employee of the Company entitled to post-employment medical, life or welfare benefits:

| Name | Retiree Health Start Date | Retiree Health End Date |
| --- | --- | --- |
| Hughey P. Nailor | 07/01/07 | 06/30/13 |
| Tomas Castro | 12/01/07 | 03/30/15 |
| Joseph Loncsar | 02/02/07 | Subsidized COBRA coverage will end 10/31/07 when the employee reaches 65 |
| Gilberto Marquez | 01/01/08 | 12/31/08 |

Employees and former Employees of the Company entitled to severance benefits:

| Name | Pay From Date | Pay Through Date |
|---|---|---|
| Bruce Maas | 01/04/07 | 08/24/07 |
| Gabriel Hernandez | 02/05/07 | 09/14/07 |
| Earnest Lollar | 01/05/07 | 10/05/07 |
| Tomas Castro | 02/05/07 | 10/12/07 |
| German Garcia | 02/05/07 | 11/09/07 |
| Michael Kliewer | 02/05/07 | 11/09/07 |
| Joseph Loncsar | 02/05/07 | 11/09/07 |
| Gilberto Marquez | 02/26/07 | 11/30/07 |
| Anthony Meitus | 04/30/07 | 02/05/08 |
| Jerry McCarty | 07/02/07 | 04/09/08 |
| Mike Kiser | 07/02/07 | 09/03/07 |

08CV3266
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE COX

# EXHIBIT B

Outstanding Balance Itemization and Reconciliation

Stopol, Inc.
Schedule of payments, principal and interest due

| | Days | Total payment | Principal balance before payment | Principal payment | Principal balance after payment | 9.0% Interest expense | Accrued interest before payment | Interest payment | Accrued interest after payment | Ending total amount due |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/30/2007 | | - | | | | | | | | 965,497.00 |
| 12/20/2007 | | (225,000.00) | 965,497.00 | (225,000.00) | 740,497.00 | | | | | 740,497.00 |
| 3/7/2008 | | (225,000.00) | 740,497.00 | (225,000.00) | 515,497.00 | | | | - | 515,497.00 |
| 3/26/2008 | | | 515,497.00 | - | 515,497.00 | | | | | 515,497.00 |
| 4/29/2008 | 34 | (100,000.00) | 515,497.00 | (95,678.30) | 419,818.70 | 4,321.70 | 4,321.70 | (4,321.70) | - | 419,818.70 |
| 5/26/2008 | 27 | - | 419,818.70 | - | 419,818.70 | 2,794.96 | 2,794.96 | - | 2,794.96 | 422,613.66 |
| 5/27/2008 | 1 | - | 419,818.70 | - | 419,818.70 | 103.52 | 2,898.47 | - | 2,898.47 | 422,717.18 |

# EXHIBIT B

Promissory Note

## PROMISSORY NOTE

$965,497                                          November 30, 2007
Maturity Date: February 29, 2008              Lincolnshire, Illinois

FOR VALUE RECEIVED, Stopol, Inc. ("Maker") hereby promises to pay to General Binding Corporation ("Payee"), by February 29, 2008 (the "Maturity Date"), the principal amount of Nine Hundred Sixty-Five Thousand Four Hundred Ninety-Seven Dollars ($965,497), together with interest from and after February 29, 2008 on the unpaid principal balance from time to time outstanding, at Payee's address at 300 Tower Parkway, Lincolnshire, Illinois 60069, or at such other place as Payee may designate from time to time in writing. Payment hereunder shall be made in lawful money of the United States of America. All liabilities and obligations of Maker under this Note, including without limitation, the obligation to pay interest and principal, are hereinafter referred to as the "Obligations." This Note is being delivered concurrently with that certain Stock Purchase Agreement dated as of the date hereof by and between the Maker and Payee (the "Agreement"). Capitalized terms used but not defined herein shall be as defined in the Agreement.

Interest shall accrue on the unpaid principal balance hereof from time to time outstanding from and after the Maturity Date at the rate of nine percent (9%) computed on the basis of a three hundred and sixty-five (365) day year. Principal payments submitted in funds not available shall continue to bear interest until collected. If payment hereunder becomes due and payable on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Illinois, the due date thereof shall be extended to the next succeeding business day, and interest shall be payable thereon at the rate specified during such extension.

Maker shall make periodic payments to Payee on the Note as it sells the Assets at the rate of eighty percent (80%) of the gross sales proceeds of each item of the Assets that Purchaser sells. Maker may, from time to time, prepay all or any portion of the principal due hereunder, together with the interest accrued thereon, without premium or penalty. This Note is subject to the security interest in the Assets granted by Maker under the Agreement, including without limitation, the right to take title to the Assets upon an Event of Default under Section 7.2(d) of the Agreement.

Maker, without notice or demand of any kind, shall be in default hereunder if (each, an "Event of Default"): (1) any of the Obligations is not paid within five (5) business days after the date due; or (2) Maker shall otherwise fail to perform any other material covenants or other obligations to be performed by Maker under this Note; or (3) Maker shall make an assignment for the benefit of creditors, or there shall be commenced by Maker or against Maker any bankruptcy, receivership, insolvency, reorganization, dissolution or liquidation proceedings; (4) any warranty, representation, certificate or statement of Maker to Payee in this Note, the Agreement or any other document furnished in connection therewith is untrue when made in any material respect; or (5) Maker shall breach any other material covenant or other material obligation under the Agreement and fail to cure such breach within thirty (30) days following notice thereof from Payee.

1670153v2/21033-27

Whenever an Event of Default shall have occurred, without demand or notice of any kind the entire unpaid amount of all Obligations shall become immediately due and payable. Upon any Event of Default, without demand or notice of any kind Payee may exercise, from time to time, any and all rights and remedies available to Payee at law or in equity, including, without limitation any rights and remedies under the Uniform Commercial Code of Illinois, as in effect from time to time. No delay on the part of Payee in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Payee of any right or remedy shall preclude other or further exercise thereof, or the exercise of any other right or remedy.

Maker warrants and represents to Payee that this Note is valid, binding and enforceable in accordance with its provisions, and no conditions exist to the legal effectiveness of this Note.

Maker may setoff against any amount owed hereunder the amount of any claim for indemnification or payment of damages to which Maker is entitled under the Agreement.

MAKER AND PAYEE (BY ACCEPTANCE OF THE BENEFITS HEREUNDER) KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY THE RIGHT EITHER OR ANY MAY HAVE TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDINGS BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, IN WHICH PAYEE AND MAKER ARE ADVERSE PARTIES. THIS PROVISION IS A MATERIAL INDUCEMENT FOR PAYEE'S GRANTING ANY FINANCIAL ACCOMMODATION TO MAKER.

Maker waives any and all presentment, demand, notice of dishonor, protest, and all other notices and demands in connection with the enforcement of Payee's rights hereunder. No default shall be waived by Payee except in writing. No delay on the part of Payee in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Payee of any right or remedy shall preclude other or further exercise thereof, or the exercise of any other right or remedy.

This Note, together with the Agreement, is the final expression of the intention of Maker and supersedes all negotiations, representations, warranties, commitments, offers, contracts (of any kind or nature whether oral or written) prior to or contemporaneous with the execution hereof. Except as set forth in the Agreement, no prior or contemporaneous representations, warranties, understandings, offers or agreements of any kind or nature, whether oral or written, have been made by Payee or relied upon by Maker in connection with the execution hereof. No modification, discharge, termination or waiver of any of the provisions hereof shall be binding upon Payee, except as expressly set forth in writing duly signed and delivered on behalf of Payee.

Neither this Note nor any of the rights, interests or obligations hereunder may be assigned or transferred by either Maker or Payee without the prior written consent of the other party, which may withhold such consent in its sole discretion, except that Payee may make such a transfer to a Payee affiliate upon written notice to Maker. This Note shall be binding upon

2

1670153v2/21033-27

Maker and its successors and permitted assigns, and shall inure to the benefit of Payee and Payee's successors and permitted assigns.

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OF THE OTHER OBLIGATIONS SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS, OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY PROPERTY MAY BE BROUGHT, AT PAYEE'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH PROPERTY MAY BE FOUND. MAKER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS, AND OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE.

This Note shall be governed and construed in accordance with the internal laws of the State of Illinois, in which state it shall be performed. Wherever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if a provision of this Note shall be prohibited by or be invalid under such law, such provisions shall be severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Note.

*Signature Page Follows*

3

1670153v2/21033-27

*Signature Page to Note*

IN WITNESS WHEREOF, Maker has caused this Note to be duly executed and delivered in Lincolnshire, Illinois, on the date first above written.

**STOPOL, INC.**

By: _____

Name: Neil E Kruschke JR

Title: CEO

A-4

08CV3266
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE COX

# EXHIBIT C

First Amendment to Stock Purchase Agreement

## FIRST AMENDMENT TO
## STOCK PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO STOCK PURCHASE AGREEMENT (the "Amendment") is entered into as of February 28, 2008, by and between General Binding Corporation ("Seller") and Stopol, Inc. (the "Purchaser").

### R E C I T A L S:

A.    Seller and Purchaser are parties to that certain Stock Purchase Agreement (the "Original Agreement") dated as of November 30, 2007 regarding the purchase and sale of the shares of capital stock of VeloBind Incorporated.

B.    Seller and Purchaser desire to amend certain provisions of the Original Agreement in order to extend certain payment and performance due dates, as set forth in this Amendment.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants set forth herein, and intending to be legally bound, the parties agree as follows:

1.    Capitalized Terms.  Capitalized terms used herein and not otherwise defined herein shall have the respective meanings provided for in the Original Agreement.

2.    Extension of certain payment and performance due dates.  Each reference to "February 29, 2008" in Sections 1.3, 7.2(b) and Section 7.2(d) of the Original Agreement is hereby deleted and replaced with "March 26, 2008."

3.    Full Force and Effect.  Except as modified by this Amendment, the terms and conditions of the Original Agreement shall remain in full force and effect.

4.    Counterparts.  This Amendment may be executed simultaneously in several counterparts and by way of facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, Seller and Purchaser have executed this Amendment as of the date first set forth above.

**GENERAL BINDING CORPORATION**

By: _____
Name: Steve Rubin
Title:   Vice President/Secretary

**STOPOL, INC.**

By: _____
Name: Neil E. Kruschke, Jr.
Title: CEO

The undersigned hereby acknowledges and agrees with the foregoing Amendment to the Original Agreement.

**ACCO Brands Corporation**

By: _____
Name: Steve Rubin
Title: Senior Vice President/Secretary

08CV3266
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE COX

# EXHIBIT D

First Amendment to Promissory Note

### FIRST AMENDMENT TO
### PROMISSORY NOTE

THIS FIRST AMENDMENT TO PROMISSORY NOTE (the "Amendment") is entered into as of February 28, 2008, by and between Stopol, Inc. ("Maker") and General Binding Corporation ("Payee").

## R E C I T A L S:

A.    Maker is the maker and Payee is the payee of that certain Promissory Note (the "Original Note") dated as of November 30, 2007 issued by Maker to Payee pursuant to that certain Stock Purchase Agreement dated as of November 30, 2007 regarding the purchase and sale of the shares of capital stock of VeloBind Incorporated.

B.    Maker and Payee desire to amend the Original Note in order to extend the maturity date thereof, as set forth in this Amendment.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants set forth herein, and intending to be legally bound, the parties agree as follows:

1.    Capitalized Terms.   Capitalized terms used herein and not otherwise defined herein shall have the respective meanings provided for in the Original Note.

2.    Extension of Maturity Date.   The Maturity Date of the Original Note is hereby extended from February 29, 2008 to March 26, 2008.

3.    Full Force and Effect.   Except as modified by this Amendment, the terms and conditions of the Original Note shall remain in full force and effect.

4.    Counterparts.   This Amendment may be executed simultaneously in several counterparts and by way of facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Maker and Payee have executed this Amendment as of the date first set forth above.

**GENERAL BINDING CORPORATION**      **STOPOL, INC.**

By:                                   By:
Name: Steve Rubin                     Name: Neil E. Kruschke, Jr.
Title:  Vice President/Secretary      Title: CEO

1693690v1
21033.00027